RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800

Federal Bar No. GC-4543

Attorneys for Plaintiff Biosense Webster, Inc.

|  |  |
|---|---|
| BIOSENSE WEBSTER, INC. | UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY |
| Plaintiff, | CIVIL ACTION NO. |
| vs. |  |
| JOSEPH HART and ST. JUDE MEDICAL, INC. | **VERIFIED COMPLAINT** |
| Defendants. |  |

Plaintiff Biosense Webster, Inc. ("BWI"), a corporation organized under the laws of the State of California, having its principal place of business at 3333 S. Diamond Canyon Rd., Diamond Bar, California 91765, by way of Verified Complaint against defendants, say:

## INTRODUCTION

This is a civil action seeking injunctive relief and damages against Joseph Hart ("Hart"), a former employee of BWI, and against St. Jude Medical, Inc. ("SJM"), a direct competitor of BWI, enjoining Hart's employment with SJM in breach of his Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement (the "Agreement").

Plaintiff seeks injunctive relief to enforce Hart's non-compete, non-solicitation and other obligations in the Agreement and to prevent immediate and irreparable harm to Plaintiff. For example, Hart was a clinical account specialist for BWI's Atrial Fibrillation ("AF") and mapping products. In this position, he was responsible for, among other things, soliciting physicians and

hospitals and instructing the customers on how to use BWI's new and innovative AF and mapping products. By no coincidence, SJM hired Hart to be a clinical account specialist for its AF, mapping, and Cardiac Rhythm Management ("CRM") products in the exact same geographical area in which he had been promoting BWI's AF and mapping products. SJM has a number of AF and mapping products that compete directly with BWI's products. Allowing Hart to work for SJM in the same geographic territory that he covered while employed by BWI and to solicit the same customers that BWI assigned to him will cause irreparable harm to BWI because he has unfairly exploited and will continue to unfairly exploit the customer relationships that BWI provided him access to while he worked for BWI to his and SJM's unfair advantage.

Moreover, Hart's employment with BWI exposed him to BWI's customers including cardiologists trained in the subspecialty of electrophysiology. These cardiologists commonly use both CRM and AF products. In fact, sometimes both products are involved in a single procedure. For example, this would occur where the patient has a CRM device and is undergoing an AF procedure. In such a situation, Hart would be representing and promoting SJM's CRM and AF products and personnel to the cardiologist, and misappropriate for the benefit of SJM the customer relationships that were developed and maintained at BWI's expense.

Furthermore, both SJM and Hart have demonstrated through recent conduct that they have no intention of abiding by the restrictions in Hart's Agreement. On multiple occasions, Hart has contacted the BWI customers assigned to him while he was employed by BWI. Hart even left his business card at one such facility stating that he is a specialist for SJM's AF and CRM products. Without this Court's intervention, Hart and SJM will impermissibly benefit by unfairly using the customer relationships he formed while he was employed by BWI, causing irreparable harm to BWI's business.

2

Hart is also in breach of his February 4, 2015 Relocation Repayment Agreement (the "Repayment Agreement").   Under that Agreement, Hart agreed to repay certain relocation expenses that BWI paid on his behalf if, within twenty-four (24) months of the commencement of his employment with BWI, he either voluntarily terminated his employment with BWI or BWI terminated his employment.  Since Hart voluntarily terminated his employment with BWI within the above-mentioned twenty-four (24) month period, he is responsible for repaying fifty (50) percent of the relocation expenses that BWI paid on his behalf pursuant to the Relocation Agreement.  BWI spent $37,474 in connection with relocating Hart to Florida and, therefore, he must repay $18,737.00.  It has been three months since Hart's departure, yet to date, Hart has made no effort to repay the monies that are due to BWI despite BWI's demand for repayment.

## THE PARTIES

1.     BWI is part of the J&J Family of Companies and develops and markets a wide range of diagnostic and therapeutic products for the treatment of cardiac arrhythmias. Specifically, BWI is on the forefront of the development of innovative catheters and mapping devices that better assist physicians diagnosing and treating potentially fatal heart conditions.

2.     Defendant SJM is a corporation organized under the laws of the State of Minnesota, having its principal place of business at 1 Saint Jude Medical Dr., St. Paul, Minnesota 55117.  St. Jude is one of the largest global medical supply companies, which competes directly with BWI.

3.     Defendant Hart is a resident of the State of Florida, who resides at 1724 SW 3rd Place, Cape Coral, Florida 33991.  Hart served as a clinical account specialist for BWI. Effective May 9, 2016, Hart tendered his two week notice and resignation to BWI and informed BWI that he had accepted a position with SJM.  He left BWI on May 20, 2016 and started his

new position with SJM on May 23, 2016.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship between Plaintiff BWI and Defendants Hart and SJM, and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

5.      Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(a)(2) because, among other reasons, Hart agreed both in the Agreement and Repayment Agreement to venue and jurisdiction in this Court.   Specifically, under Paragraph 19 of the Agreement and under Paragraph 5 of the Repayment Agreement, Hart consented to personal jurisdiction and venue in New Jersey.

## BWI AND THE J&J FAMILY OF COMPANIES

6.      Johnson & Johnson ("J&J") is a corporation organized under the laws of the State of New Jersey, having its principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933. J&J is the parent company of subsidiaries and affiliates engaged in the business of developing, manufacturing and marketing a wide variety of health care products, and providing related services, for the consumer, pharmaceutical and professional markets.  J&J's subsidiaries and operating companies market their products to customers located throughout the United States and the world.

7.      BWI is part of the J&J Family of Companies.  BWI is recognized worldwide as a leader in the science behind the diagnosis and treatment of cardiac arrhythmias with more than 1,300 professionals in 40 countries around the world.  Nearly three decades ago, founder and pioneer, Will Webster of Webster Laboratories, developed the first useful deflectable tip catheter.  Shortly thereafter, another pioneer, Dr. Shlomo Ben-Haim, the founder of Biosense,

Inc., developed 3D cardiac mapping and navigation technology, providing new levels of insight, precision and safety in the diagnosis and treatment of cardiac arrhythmias, including AF and ventricular tachycardia.

8.    3D cardiac mapping is critical in treating cardiac arrhythmias. Specifically, with the use of 3D cardiac mapping, a physician can pinpoint the area in the heart that is experiencing the arrhythmia and then use catheters and other medical devices to treat the arrhythmia.

9.    In 1998, Dr. Ben-Haim's Biosense Inc. joined with Webster Laboratories to form BWI. Now, nearly two decades later, BWI continues to be on the forefront of innovation and shaping the future of electrophysiology. Electrophysiology is the study of electrical activity in the heart to find where an arrhythmia (abnormal heartbeat) is coming from within the heart.

10.    BWI offers a broad portfolio of products including therapeutic catheters, diagnostic catheters, ultrasound catheters, and advanced 3-D mapping modules. These products treat a variety of cardiac arrhythmias and give physicians the ability to deliver optimal treatment through BWI's innovative Contact Force and Irrigated Ablation technology products.

11.    BWI's effectiveness in the marketplace depends, in part, on close contact between its clinical account specialists and the medical community that BWI serves. BWI's clinical account specialists receive extensive in-house and field training in all aspects of product knowledge, professional skills and customer needs.

## HART'S EMPLOYMENT WITH BWI

12.    Hart started his employment with BWI in February 2015 as a clinical account specialist. Hart previously worked for SJM as a clinical account specialist covering the New Jersey/New York Area. However, in recognition of Hart's non-compete obligations to SJM, Hart re-located to Florida.

13.     Hart had no customer relationships in Florida before working for BWI. Therefore, all of the customer relationships that Hart developed in Florida, while employed by BWI, were customer relationships that BWI developed over the years, and BWI then provided Hart with access to those customer relationships.

14.     As consideration for his relocation, BWI provided Hart with not only a $15,000 signing bonus, but also a relocation package pursuant to the Repayment Agreement.

15.     Hart executed the Repayment Agreement on February 4, 2015.  A true and correct copy of the Repayment Agreement is attached hereto as Exhibit A.  The Repayment Agreement provides in pertinent part:

> If, after the date of this Agreement through two years following the start date of Employment at the new location, (i) Employee voluntarily terminates Employment (other than to work for an affiliate of Company) or (ii) Company terminates Employment for cause for a Group 1 or Group 2 violation (which does not include layoffs or position eliminations), Employee agrees to repay to Company according to the following schedule for Relocation Expenses paid hereunder:  (i) 100% of the Relocation Expenses in the event of any such termination during the first 12 months following the start date at the new location; and (ii) 50% of the Relocation Expenses in the event of any such termination during 13-24 months following the start date at the new location.

16.     BWI expended $37,474 to relocate Hart to Florida.

17.     In addition, as a condition of his employment and because of his access to customer relationships, Hart signed an Employee Secrecy, Non-Competition and Non-Solicitation Agreement ("Agreement") on or about February 4, 2015.  A true and correct copy of the Agreement signed by Hart is attached hereto as Exhibit B.   The Agreement provides in pertinent part:

> 6.     Except as provided in the next sentence or to any extent prohibited by applicable law, during [my] employment with any COMPANY and for a period of eighteen (18) months after the termination of [my] employment (whether voluntary or involuntary), [I] will not, directly or indirectly, perform, or assist others to perform, work for any COMPETITOR in any position and in any

location in which [I] could disadvantage any COMPANY or advantage the COMPETITOR by: (a) [my] disclosure or use of CONFIDENTIAL INFORMATION to which [I] had access; (b) [my] use of the specialized training provided to [me] by [my] EMPLOYER or any COMPANY for which [I] have worked; and/or (c) [my] use of CUSTOMER relationships and goodwill. Following the termination of [my] employment, [I] will be permitted to work for an entity or person if (a) the COMPANY with a competitive interest determines that the entity or person for which [I] wish to work has a diversified business and no portion of the business for which [I] would render services is a COMPETITOR, and (b) prior to [my] commencing any work, such entity or person and [I] each provides written assurances satisfactory to the COMPANY with a competitive interest that [I] will not render any services for the portion of the business that is a COMPETITOR for a period of eighteen (18) months after [my] last date of employment within the COMPANY.  The restrictions of this Paragraph

7.      [I] acknowledge that the COMPANY's relationships with CUSTOMERS and the goodwill associated with such relationships are important and valuable business assets that results from the COMPANY's significant investment of its time and resources.  Therefore, [I] agree that during [my] employment and for eighteen (18) months after the termination of [my] employment (whether voluntary or involuntary) with the COMPANY, [I] shall not, directly or indirectly, contact, call upon, solicit business from, sell to, or render services to, or assist others in contacting, calling upon, soliciting business from, selling to, or rendering services to, any CUSTOMER: (a) in connection with the sale, support, service or use of any product or service that resembles or competes with or that may be substituted for one that is being sold, under development or acquired by any COMPANY; (b) if [I am] working with, for, or as a COMPETITOR of any COMPANY; and/or (c) if [my] activities could damage or interfere with the CUSTOMER relationships of any COMPANY that [I] worked for during the last eighteen months of [my] employment.

## HART'S ACCESS TO BWI'S CUSTOMERS

18.     As a clinical account specialist, Hart had access to and regular contact with BWI's customers in his geographic area.   In connection with this position, Hart learned a significant amount about BWI's cardiac electrophysiology procedures, including, but not limited to, how each of the BWI catheters and their 3-D imaging technology, such as the CARTOSOUND® module and CARTO® 3-D mapping system, work.  In fact, a primary function of his position was educating hospital staff on electrophysiology and the utilization of the BWI product line.

19.     As a result of his position with BWI, Hart used BWI's goodwill, money and resources to develop customer relationships with hospitals, facilities and physicians. These are protectable relationships under the Agreement that Hart signed as well as under applicable law.

20.     In sum, through his employment as a clinical account specialist, Hart was provided with direct access to and obtained detailed knowledge of BWI's customer relationships. In addition, and just as important, Hart developed relationships with BWI's customers in the Florida territory – relationships that he never had before joining BWI.

## HART'S PLANNED EMPLOYMENT BY ST. JUDE

21.     On May 6, 2016, Hart informed BWI that he was resigning and that he had accepted the position of Senior Field Clinical Engineer/Senior Technical Specialist with SJM for SJM's AF, mapping and CRM products in the exact same geographical area in which he had been promoting BWI's AF and mapping products.    In fact, SJM assigned Hart the same customers that BWI assigned Hart when he was working for BWI. The customer base (i.e., cardiologists) for both CRM and AF products are the same because cardiologists use both CRM and AF products in their surgical cases, sometimes in the same procedure.  Thus, regardless if a SJM sales representative is selling CRM or AF products, the customer base will be the same. Physicians are more likely to purchase AF products from a company that is also providing them with CRM products

22.     Hart provided his notice of resignation to BWI on May 9, 2016.

23.     His last day of employment with BWI was May 20, 2016.

24.     On May 19, 2016, BWI issued a letter to Hart notifying him of his obligations under the Agreement.  A true and correct copy of the letter dated May 19, 2016 is attached hereto as Exhibit C.

25.     Even prior to his departure from BWI on May 20, 2016, Hart violated his duty of loyalty to BWI. Specifically, before his last day with BWI, Hart had already changed his LinkedIn page to reflect that he was an employee of SJM and that he was working on SJM's AF and CRM products.   A true and correct copy of Hart's LinkedIn page is attached hereto as Exhibit D.

26.     In addition, between May 9 and May 20, BWI witnessed Hart at one of BWI's largest customers, HealthPark Medical Center, that was assigned to Hart.  Hart was there on May 11, 2016 assisting with a BWI AF surgical case wearing SJM gear.

27.     After May 20, 2016, a BWI employee witnessed Hart at HealthPark Medical Center.  The BWI employee noticed that Hart left a SJM card at HealthPark Medical Center. The SJM card had Hart's old SJM phone number on it so Hart handwrote his new SJM phone number.  The old SJM card stated that he was an AF specialist.   A true and correct copy of a photo of Hart's old SJM card is attached as Exhibit E.

28.     Between May 20, 2016 and approximately July 6, 2016, Hart repeatedly performed CRM procedures and was involved and covered AF and mapping procedures with customers assigned to him while he was employed by BWI, including a hospital customer, HealthPark Medical Center, and two physician customers, Dr. Sensequa, and Dr. Agarwal.

29.     Upon information and belief, between May 20, 2016 and approximately July 6, 2016, Hart repeatedly performed CRM procedures and was involved and covered AF and mapping procedures with other BWI customers assigned to him including NCH Health Care System – Naples Community Hospital, Dr. Vatthyam, Dr. Yin, Dr. Plunkitt, and Dr. Burton.

30.     Hart informed his former BWI manager, Brandon Allen, that SJM will compensate him on AF procedures/sales in his territory and that SJM had advised him to ignore the Agreement.

31.     Upon information and belief, Hart has misrepresented to staff and physicians at NCH Health Care System – Naples Community Hospital that the attorneys are working things out so he can continue soliciting his former BWI accounts.

32.     Hart's contacts with the BWI customers at issue in connection with SJM's AF products, which compete with BWI's AF products, violate his Agreement.

33.     In addition, Hart's contacts with such BWI customers in connection with SJM's CRM products are clearly intended to interfere with and damage BWI's relationships with such customers so that SJM can sell its CRM and AF products to such customers.

34.     Money damages would not adequately compensate BWI for the losses and injuries it would suffer, leaving BWI with no adequate remedy at law. For example, if Hart were to use the relationships he developed during his employment with BWI to convince them to purchase SJM's AF and CRM products, it would not only damage BWI's business in the region, but also provide SJM with the unfair benefit of contacts and customers that BWI spent substantial resources developing.

## **FIRST COUNT**

35.     Plaintiff repeats the allegations contained in the foregoing paragraphs and incorporates those allegations in this Count by reference.

36.     Hart's intended and actual employment with SJM will and does constitute a breach of the Agreement because Hart will be employed by a Competitor, as defined in the Agreement, within 18 months after termination of his employment with BWI. Hart's intended

and actual employment with SJM will and does constitute a breach of the Agreement because Hart will be contacting the same customers that were assigned to him while he was employed by BWI.

37.     As a result of these breaches, BWI will suffer immediate, severe and irreparable harm to their business, and other damages and injuries.

## SECOND COUNT

38.     Plaintiff repeats the allegations contained in the foregoing paragraphs and incorporates those allegations in this Count by reference.

39.     As an employee of BWI, Hart had duties of loyalty that existed independent of his Agreement to refrain from interfering with BWI's customer relationships.

40.     Hart violated his duties of loyalty to BWI after he provided his notice of resignation to BWI and before he began his employment with SJM.   In addition, if Hart is allowed to work for SJM, a direct competitor of BWI, he will breach his duty by interfering with BWI's customer relationships.

41.     As a result of the breach of Hart's duties, BWI will suffer immediate, severe and irreparable harm to its business, and other damages and injuries.

## THIRD COUNT

42.     Plaintiff repeats the allegations contained in the foregoing paragraphs and incorporates those allegations in this Count by reference.

43.     SJM is aware that BWI has entered into an Agreement with BWI that, among other things, precludes BWI from, directly or indirectly, contacting, calling upon, soliciting business from, selling to, or rendering services to, or assisting others in contacting, calling upon, soliciting business from, selling to, or rendering services to, the customers that he was assigned

to while employed by BWI.  SJM is aware that hiring BWI would constitute a breach of the Agreement.

44.     Despite that knowledge, SJM has conspired with and tortiously induced Hart to breach both his Agreement and common law duties to BWI.

45.     As a result of SJM's actions, BWI will suffer immediate, severe and irreparable harm to their business, and other damages and injuries.

## FOURTH COUNT

46.     Plaintiff repeats the allegations contained in the foregoing paragraphs and incorporates those allegations in this Count by reference.

47.     By hiring Hart, SJM and Hart have wrongfully contracted, combined, conspired and agreed to: (1) engage in unfair competition; (2) breach common law obligations; (3) tortiously interfere with the contractual relationships and prospective economic advantage of BWI; (4) wrongfully convert and misappropriate customer relationships of BWI; and (5) unjustly enrich themselves at the expense of BWI.

48.     The acts of SJM and Hart constitute wrongful and malicious conduct undertaken without legal justification and with the knowledge and intent that their actions will cause substantial damage and injury to BWI.

49.     Unless SJM and Hart are immediately enjoined and restrained, BWI will suffer immediate and irreparable injury for which they have no adequate remedy at law or in money damages, and other damages and injuries.

## FIFTH COUNT

50.     Plaintiff repeats the allegations contained in the foregoing paragraphs and incorporates those allegations in this Count by reference.

51.     Under the Repayment Agreement, Hart agreed to repay relocation expenses that BWI paid on his behalf if, within twenty-four (24) months of the commencement of his employment with BWI, he either voluntarily terminated his employment with BWI or BWI terminated his employment.

52.     BWI expended $37,474 to relocate Hart to Florida pursuant to the Repayment Agreement.

53.     Hart terminated his employment with BWI within twenty-four (24) months of the commencement of his employment with BWI and, therefore, pursuant to the Repayment Agreement, Hart owes BWI fifty percent (50%) of the $37,474 in relocation expenses or $18,737.

54.     Hart has refused to pay BWI the $18,737 despite BWI making demand for payment.

55.     As a proximate result of Hart's breaches of the Repayment Agreement, BWI has suffered and will continue to suffer damages, including attorneys' fees and costs.

## SIXTH COUNT

56.     Plaintiff repeats the allegations contained in the foregoing paragraphs and incorporate those allegations in this Count by reference.

57.     Hart converted funds in the amount of $18,737 (which number represents fifty percent (50%) of the relocation expenses) that belong to BWI.

## SEVENTH COUNT

58.     Plaintiff repeats the allegations contained in the foregoing paragraphs and incorporate those allegations in this Count by reference.

59.     By retaining $18,737, Hart has been unjustly enriched.

60.     Hart's retention of $18,737 has damaged BWI.

WHEREFORE, BWI demands judgment against Defendants, jointly and severally:

A.     enter temporary, interlocutory and permanent restraining orders providing that Defendant Hart be enjoined from:

(i)     for a period of 18 months, directly or indirectly, contacting, calling upon, soliciting business from, selling to, or rendering services to, or assisting others in contacting, calling upon, soliciting business from, selling to, or rendering services to, any of the Customers, as that term is defined in the Agreement;

(ii)    for a period of 12 months, directly or indirectly, on his own behalf or on behalf of others, including, but not limited to, Defendant SJM, solicit, recruit, interview, hire, identify, suggest or comment on any individual employed by any Company, as that term is defined in the Agreement, to leave his or her employment with the Company;

(iii)   otherwise violating any of the terms of the Agreement or common law obligations.

B.   enter temporary, interlocutory and permanent restraining orders providing that Defendant Hart and its officers, agents and employees, be enjoined from:

(i)   for a period of 18 months causing or permitting Defendant Hart to directly or indirectly, contacting, calling upon, soliciting business from, selling to, or rendering services to, or assisting others in contacting, calling upon, soliciting business from, selling to, or rendering services to, any of the Customers, as that term is defined in the Agreement;

(ii)   for a period of 12 months causing or permitting Defendant Hart to directly or indirectly, on his own behalf or on behalf of others, including, but not limited to, Defendant SJM, solicit, recruit, interview, hire, identify, suggest or comment on any individual employed by any Company, as that term is defined in the Agreement, to leave his or her employment with the Company;

(iii)   from causing or permitted Defendant Hart from otherwise violating any of the terms of the Agreement or common law obligations.

C.   Ordering that the injunctive relief shall bind Defendants Hart and SJM and their officers, agents, servants, employees, attorneys and any other persons who are in active concert or participation with them or any of them;

D.      Ordering Hart to repay $18,737 to BWI, which represents the portion of the relocation package owed to BWI pursuant to the Repayment Agreement signed by Hart on February 4, 2015;

E.      Awarding compensatory damages to BWI;

F.      Awarding punitive damage to BWI;

G.      Awarding cost and attorneys' fees to BWI including under Paragraph 14 of the Agreement and Paragraph 2(e) of the Repayment Agreement;

H.      Awarding such other and further relief as the Court deems just and equitable.

RIKER, DANZIG, SCHERER, HYLAND
& PERRETTI LLP

Attorneys for Plaintiff Biosense Webster, Inc.

By: /s/    Glenn A. Clark    .
        Glenn A. Clark

Date: August 23, 2016

## VERIFYING CERTIFICATION

I, Brandon Allen, of full age, certify as follows:

1.     I am the Regional Business Director of Biosense Webster, Inc.

2.     I have read the Verified Complaint to which this Verifying Certification is attached and, with the exception of Paragraphs 26, 27, and 28 (which shall be verified by Fransisco Pagan), the factual allegations set forth therein are true unless expressly stated as based upon information and belief.

3.     I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

Brandon Allen

Dated: August 18, 2016

**VERIFYING CERTIFICATION**

I, Fransisco Pagan, of full age, certify as follows:

1.    I am a Clinical Account Specialist for Biosense Webster, Inc.

4.    I have read Paragraphs 26, 27, and 28 of the Verified Complaint to which this Verifying Certification is attached and verify that the factual allegations set forth in Paragraphs 26, 27, and 28 are true.

5.    I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

_____
Fransisco Pagan

Dated: August 16, 2016

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

It is hereby certified that as of the date hereof, the matter in controversy is not the subject of any other litigation, arbitration or administrative proceeding currently pending in any court or before any other body except for an action filed by defendants in the Middle District of Florida captioned as <u>Joseph Hart and St. Jude Medical S.C., Inc. v. Biosense Webster, Inc.</u>, Case No. 2:16-cv-00520-UA-CM

RIKER, DANZIG, SCHERER, HYLAND
  & PERRETTI LLP
Attorneys for Plaintiff Biosense Webster, Inc.

By: <u>/s/ Glenn A. Clark      </u>.
    Glenn A. Clark

Headquarters Plaza
One Speedwell Avenue
PO Box 1981
Morristown, NJ  07962-1981
(973) 538-0800

Date: August 23, 2016

# EXHIBIT A

# Employee Relocation Repayment Agreement

This Employee Relocation Repayment Agreement (the "Agreement") is dated as of 02/04/2015 and agreed to by Joseph Hart of Northport, NY 11768 ("Employee").

Whereas, in connection with Employee's hiring by, transfer to, or assignment to Biosense Webster, Inc. ("Company," which includes both Company as well as affiliates thereof), Company will pay for or reimburse certain relocation expenses of Employee ("Relocation Expenses"); and

Whereas, Employee agrees to repay Company the Relocation Expenses if Employee voluntarily terminates employment with Company ("Employment"), or if Employment is terminated by Company, or an affiliate of it, for cause as set forth below;

NOW, THEREFORE, in consideration of Company paying for or reimbursing Relocation Expenses, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Employee agrees to the following:

1.      Employee acknowledges that in connection with Employee's hiring by, transfer to, or assignment to Company (collectively referred to as "assignment to Company"), Company will incur costs to pay for or reimburse Relocation Expenses.  Employee further acknowledges that any such Relocation Expenses shall be as provided on the attached relocation form and subject to and as explained more fully in Company's Domestic Relocation Policy Guidelines, including any tax gross-up, all of which shall fall within the definition of "Relocation Expenses."  Notwithstanding the foregoing, Employee understands and agrees that there are certain types of reimbursable Relocation Expenses that may be treated as taxable income to Employee, and that Employee will be fully responsible for the payment of any taxes that are due as a result.

2.      (a)      If, after the date of this Agreement through two years following the start date of Employment at the new location, (i) Employee voluntarily terminates Employment (other than to work for an affiliate of Company) or (ii) Company terminates Employment for cause for a Group 1 or Group 2 violation (which does not include layoffs or position eliminations), Employee agrees to repay to Company according to the following schedule for Relocation Expenses paid hereunder:

          (i) 100% of the Relocation Expenses in the event of any such termination during the first 12 months following the start date at the new location; and

          (ii) 50% of the Relocation Expenses in the event of any such termination during 13-24 months following the start date at the new location.

       (b)      Employee agrees to reimburse Company 100% of the Relocation Expenses if Employee fails to commence his/her assignment to Company within 60 days of the start date of the new assignment, unless Company otherwise agrees in writing.

(c) If Employment is terminated within the meaning of clause 2(a) above, Employee shall pay Company the Relocation Expenses in accord with the foregoing within 30 days of the Employee's last day of Employment. If Employee fails to commence his/her assignment to Company within 60 days of the start date of the new assignment within the meaning of clause 2(b) above, Employee shall pay Company all amounts due in accordance with the foregoing within 10 days after the period specified in clause 2(b) expires.

(d) With respect to any Relocation Expenses that Employee is required to repay as set forth above, Employee understands and agrees that Company may pursue any remedy available by law. Without limiting the foregoing, Employee understands and agrees that Company may; in accordance with applicable law, (i) withhold any amounts, including, but not limited to, any salary, bonus or commissions, due to Employee, up to the amount that Employee is required to repay and (ii) use a collection agency.

(e) If Employee fails to repay any portion of any Relocation Expense pursuant to clause 2(a) and/or clause 2(b) within the time established in clause 2(c), Employee will be liable to Company for any expenses, including, but not limited to, attorneys' fees and costs, pre-judgment interest, and post-judgment interest incurred by Company to pursue the repayment of the Relocation Expenses. If the amount of the attorneys' fees and costs or other expenses incurred by Company exceed the Relocation Expenses that Employee must repay, Employee will still be liable to Company for the full amount of all attorneys' fees and all other expenses. Company shall be deemed to have prevailed in its efforts to pursue the repayment of Relocation Expenses, and entitled to recover its attorneys' fees and expenses, if Company recovers any portion of the Relocation Expenses.

3.   Employee understands that (a) his/her Employment is "at will," (b) this Agreement is not a contract of employment, (c) this Agreement does not imply that his/her Employment will continue for any period of time, and (d) this Agreement does not confer any rights with respect to the duration of Employment.

4.   Employee understands that no Relocation Expenses can be processed until a signed copy of this Agreement is signed and faxed to 203-749-5015. If a fax is not available, a copy can be mailed overnight to the Manager of Relocation Services at the following address:

> JJSI Relocation Services Team
> Cartus
> 40 Apple Ridge Road
> Danbury, CT  06810

5.   (a) This Agreement shall be governed by the laws of the State of New Jersey, exclusive of choice of law provisions. Employee agrees that any legal action arising out of, in connection with, or related to this Agreement may be commenced by Employee and/or Company only in the State or Federal courts located in the State of New Jersey, notwithstanding the location of Employee's assignment to Company. Employee further agrees and acknowledges that the State of New Jersey has a substantial interest in this transaction. In addition, Employee consents to the personal jurisdiction of the State and Federal courts located in New Jersey for such purposes.

(b)   Employee shall not assign this Agreement or any part hereof without Company's prior written consent, and any such purported assignment without such consent shall be void.  This Agreement shall be binding on and shall inure to the benefit of Company's successors and assigns, including collection agencies.

(c)  This Agreement constitutes the entire agreement and understanding of Employee with respect to the subject matter hereof and there are no promises, representations, conditions, provisions or other terms except those set forth in this Agreement. This Agreement supersedes all previous undertakings, agreements and representations between the parties, written or oral, with respect to the subject matter hereof.  No modification of, addition to, or waiver of any provisions of this Agreement shall be binding unless in a writing signed by Company.

(d)  Nothing contained herein shall confer any rights upon or create any duties toward any third party.

WHEREFORE Employee has read, understood, and affirmed the terms and conditions of this Agreement by affixing his/her signature hereto.

EMPLOYEE,

_____       _____
Name (Signature):                                                    Date

_____
Name (Printed):

cc:  Manager, JJSI Relocation Services Team
      Company Human Resources, Personnel File

U.S. Domestic Relocation Repayment Form          3 of 3
Version 7.0  10/1/14

# EXHIBIT B

## EMPLOYEE SECRECY, INTELLECTUAL PROPERTY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT

**Name of Employee: Joseph Hart**

**TO BE PROVIDED BY H.R.**

**Employee WWID:**   1043084

### A. Introduction

**Biosense Webster, Inc.** is one of numerous entities within the Johnson & Johnson Family of Companies. The businesses in which these entities are engaged are extremely competitive. During your employment, you will be given access to CONFIDENTIAL INFORMATION (as defined below), will develop, maintain or enhance business and/or customer relationships and receive training relating to the business of **Biosense Webster, Inc.** and may have access to CONFIDENTIAL INFORMATION relating to the business of other entities within the Johnson & Johnson Family of Companies. This Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement (this "Agreement") also applies to any employment you may subsequently have with any other entity within the Johnson & Johnson Family of Companies.

This Agreement sets forth your obligations during and after your employment with the COMPANY including, but not limited to, defining certain rights and obligations concerning intellectual property, non-solicitation-of-business, non-competition, non-solicitation of employees and publicity.

### B. Definitions

As used in this Agreement:

**COMPANY** means individually and/or collectively **Biosense Webster, Inc.**, Johnson & Johnson, and all other entities within the Johnson & Johnson Family of Companies, and their respective successors and assigns. An entity is within the Johnson & Johnson Family of Companies if it is at least 50 percent owned by Johnson & Johnson, either directly or indirectly.

**EMPLOYER** means **Biosense Webster, Inc.** or, if applicable, any other COMPANY by which you are (or were) employed at any time. For purposes of this Agreement, after you are no longer employed by any COMPANY, EMPLOYER means any COMPANY by which you were last employed.

**INVENTIONS** means (a) discoveries, improvements, ideas, concepts, research, data, reports, plans, systems, technology, products, methods, and processes, whether or not patentable, and (b) trademarks, service marks, trade dress, design marks, design rights, logos, domain names, handles, user names, and trade names, whether or not registered, that relate to any work assigned to or performed by you for or on behalf of your EMPLOYER or any COMPANY or to the actual or anticipated research or development or other business activities of your EMPLOYER or any COMPANY.

**CONFIDENTIAL INFORMATION** means information or a compilation of information, in any form (tangible or intangible) about the business of the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, which is disclosed to you or known by you as a result of your employment by the COMPANY. CONFIDENTIAL INFORMATION includes, but is not limited to, (a) such things as trade secrets, inventions, research, development, strategies, operations, logistics, manufacturing, distribution, purchasing, licensing, business planning and development, products in existence or under development, product performance

1

information, product technical information, product know-how, discoveries, methodologies, algorithms, formulas, protocols, reports, data, results, observations, computer programs, patent applications, strategic plans, hypotheses, research directions, developments, improvements, drawings, designs, specifications, opinions of legal counsel, clinical trials, draft or final regulatory filings, finance, computer software or hardware, automated systems, engineering, marketing, merchandising, pricing, training, training methods or procedures, selling, sales, personnel, customers or clients, including, but not limited to, customer lists, sales volumes or strategies, number or location of sales representatives, names or significance of the COMPANY's customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, likes, dislikes, habits or other customer or client-specific information; and (b) personal or business information about the COMPANY's employees, customers, vendors, consultants and agents which is not publicly known and which is disclosed to you or known by you in connection with your employment by the COMPANY including, but not limited to, performance reviews and other performance related information, organizational charts, compensation, benefits, and rankings.

**COMPETITOR** means any person or entity including, but not limited to, you or anyone acting on your behalf, (a) that is engaged or preparing to be engaged in research, development, production, marketing, selling of, or consulting on a product, process, technology, machine, invention or service in existence or under development that resembles or competes with, or can be substituted for, a product, process, technology, machine, invention, or service of any COMPANY that is in existence or under development; (b) that could benefit from: (i) CONFIDENTIAL INFORMATION; (ii) your use of the specialized training provided to you by your EMPLOYER or any COMPANY; and/or (c) that could benefit from your use of the COMPANY's customer relationships and/or goodwill.

**CUSTOMER** means any entity, client, account or person including the employees, agents, or representatives of the foregoing, or any entity or person who participates, influences or has any responsibility in making purchasing decisions on behalf of such entities, clients, accounts or persons, to whom or to which you contacted, solicited any business from, sold to, rendered any service to, were assigned to, had management responsibilities for, received commissions or any compensation on, or promoted or marketed any products or services to, during the last eighteen months of your employment with any COMPANY.

## C. Rights and Obligations

In consideration of your receipt of CONFIDENTIAL INFORMATION, training, your employment or the continuation of your employment with your EMPLOYER, your access to customer relationships and good will, and/or for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, you agree, and intend to be legally bound, as follows:

1. You will disclose promptly in writing to your EMPLOYER or its designee all INVENTIONS conceived, created and/or reduced to practice by you during your employment whether or not during your hours of employment and/or whether or not with the use of your EMPLOYER's or any COMPANY's facilities, materials or personnel, either solely or jointly with another or with others, and related to the actual or anticipated business or activities of your EMPLOYER or any COMPANY, or related to their actual or anticipated research and development or suggested by or resulting from any task assigned by you for, or on behalf of, your EMPLOYER or any COMPANY. Except as otherwise provided in Paragraphs 22, 23 and 24 of this Agreement, you agree to assign and hereby assign your entire right, title and interest in all INVENTIONS (including, but not limited to, all related patent applications and all priority rights

relating to any INVENTIONS or to any related patent applications) to your EMPLOYER or its designee. You will not assert any rights to any INVENTIONS as having been made or acquired by you prior to your being employed by your EMPLOYER unless such INVENTIONS are identified on a sheet attached hereto and signed by you and your EMPLOYER as of the date of this Agreement.

2. All copyrightable works, including, but not limited to, writings, articles, publications, presentations, reports, computer programs, drawings, tables, graphs, images, artwork, photographs, videos, musical works, sound recordings and audiovisual works, that you create or prepare during and within the scope of your employment with your EMPLOYER or relating to work performed for any COMPANY whether or not created or prepared during your hours of employment and/or whether or not with the use of your EMPLOYER's or any COMPANY's facilities, materials or personnel, and regardless whether the creation or preparation of such work was specifically requested by your EMPLOYER, shall be considered works made for hire, and the worldwide copyrights therein shall be the sole and exclusive property of your EMPLOYER or such COMPANY. If any such copyrightable work or portion thereof shall not legally qualify as a work made for hire, or shall subsequently be held not to be a work made for hire, you agree to assign and hereby assign to your EMPLOYER, such COMPANY, or their designee all your right, title and interest therein. You agree to promptly disclose all such works to your EMPLOYER.

3. You will execute any applications, assignments or other instruments that your EMPLOYER considers necessary to apply for, obtain, transfer and maintain a patent, or trademark or copyright registration or other proprietary rights to protect the interests of your EMPLOYER or the COMPANY with respect to INVENTIONS, or copyrightable works conceived, reduced to practice, created, authorized or made by you during your employment. These obligations shall continue beyond the termination of your employment and shall be binding upon your executors, administrators and other legal representatives.

4. You will not use or disclose to the COMPANY any confidential information belonging to others, including your former employers, if any. You represent there is no agreement, contract, non-compete covenant, non-disclosure/secrecy agreement or similar restriction that would prohibit or restrict your ability to perform your job-related duties that you have not disclosed and provided to your EMPLOYER.

5. You acknowledge that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a COMPETITOR, will cause immediate irreparable injury to the COMPANY. Except as required by your duties for your EMPLOYER, you will not use, disclose, disseminate, lecture upon or publish any CONFIDENTIAL INFORMATION, either during your employment with your EMPLOYER or thereafter, unless you first obtain the prior written consent of your EMPLOYER or any COMPANY to which the CONFIDENTIAL INFORMATION relates.

6. Except as provided in the next sentence or to any extent prohibited by applicable law, during your employment with any COMPANY and for a period of eighteen (18) months after the termination of your employment (whether voluntary or involuntary), you will not, directly or indirectly, perform, or assist others to perform, work for any COMPETITOR in any position and in any location in which you could disadvantage any COMPANY or advantage the COMPETITOR by: (a) your disclosure or use of CONFIDENTIAL INFORMATION to which you had access; (b) your use of the specialized training provided to you by your EMPLOYER or any COMPANY for which you have worked; and/or (c) your use of CUSTOMER relationships and goodwill.

Following the termination of your employment, you will be permitted to work for an entity or person if (a) the COMPANY with a competitive interest determines that the entity or person for which you wish to work has a diversified business and no portion of the business for which you would render services is a COMPETITOR, and (b) prior to your commencing any work, such entity or person and you each provides written assurances satisfactory to the COMPANY with a competitive interest that you will not render any services for the portion of the business that is a COMPETITOR for a period of eighteen (18) months after your last date of employment within the COMPANY. The restrictions of this Paragraph 6 will not apply with respect to services you render in California after termination of your employment within the COMPANIES that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

7. You acknowledge that the COMPANY's relationships with CUSTOMERS and the goodwill associated with such relationships are important and valuable business assets that results from the COMPANY's significant investment of its time and resources. Therefore, you agree that during your employment and for eighteen (18) months after the termination of your employment (whether voluntary or involuntary) with the COMPANY, you shall not, directly or indirectly, contact, call upon, solicit business from, sell to, or render services to, or assist others in contacting, calling upon, soliciting business from, selling to, or rendering services to, any CUSTOMER: (a) in connection with the sale, support, service or use of any product or service that resembles or competes with or that may be substituted for one that is being sold, under development or acquired by any COMPANY; (b) if you are working with, for, or as a COMPETITOR of any COMPANY; and/or (c) if your activities could damage or interfere with the CUSTOMER relationships of any COMPANY or divert business from such CUSTOMERS to a COMPETITOR. For purposes of this Paragraph 7, COMPANY shall mean your EMPLOYER and any COMPANY that you worked for during the last eighteen months of your employment. The restrictions of this Paragraph 7 will not apply to limit services you render in California after termination of your employment that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

8. Except to any extent prohibited by applicable law, you agree that for a period of twelve (12) months after your last date of employment within the COMPANY, you will not, directly or indirectly, on your own behalf or on behalf of others, solicit, recruit, interview, hire, identify, suggest or comment on any individual employed by any COMPANY to leave his or her employment with the COMPANY. The restrictions of this Paragraph 8 will not apply to limit services you render in California after termination of your employment that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

9. For purposes of enabling your EMPLOYER and any other COMPANY with a competitive interest to monitor your compliance with your obligations under this Agreement, you will notify your EMPLOYER in writing, at least two weeks before your last date of employment with your EMPLOYER, and provide at least two weeks advance written notice whenever within the eighteen (18)-month period following the termination of employment you plan to commence work with a new entity or person of: your start date, the identity of each entity or person for which you will be working, your new title, and the responsibilities of the position (such as the products and/or services you will be working on for the new entity or person, and any territory you may cover ). During this time period you will also provide such notice regarding any planned or actual changes in your work responsibilities.  You will provide the notices required under this Paragraph to the highest-ranking employee in the Human Resources organization of your EMPLOYER and will do so promptly, and, in any event, at least two (2) weeks prior to commencing any new position or (if

applicable) any new responsibilities.   You will promptly provide any additional information requested by your EMPLOYER to determine compliance with your obligations under this Agreement.   The information you provide pursuant to this Paragraph should not include any confidential information belonging to anyone outside the COMPANY and will not be used except to evaluate your compliance under this Agreement, to enforce those obligations, and to seek remedies for your breach or another party's interference with your obligations under this Agreement.

10. If your employment with your EMPLOYER terminates for reasons other than misconduct, then you may be entitled to certain payments if you satisfy the requirements and procedures set forth and referenced in Addendum A, which is incorporated by reference herein. If you voluntarily terminate or resign from your employment with your EMPLOYER, then you shall not be eligible for such payments.

11. Upon termination of your employment with your EMPLOYER, you will turn over to an individual designated by your EMPLOYER all property in your possession or custody belonging to your EMPLOYER or any COMPANY, including any computer or electronic equipment.  You shall not retain copies of any correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents in any form whatsoever (including information contained in computer memory or on any computer disk or drive) relating in any way to the business of your EMPLOYER or the COMPANY that were entrusted to, created by or obtained by you at any time during your employment with the COMPANY.

12. You acknowledge that your EMPLOYER and/or the COMPANY have a legitimate interest in protecting its CONFIDENTIAL INFORMATION, its customer relationships and the goodwill associated with such customer relationships, and the provision to you of specialized training.  You further acknowledge that the restrictive covenants contained in this Agreement are reasonably necessary to ensure your EMPLOYER or the COMPANY is able to protect its legitimate interests and, therefore, you agree not to, in any action, suit or other proceeding, deny the reasonableness of, or assert the unreasonableness of, the restrictive covenants and you hereby waive any such defense. In addition, you agree that the restrictive covenants in this Agreement are separate and independent obligations and, therefore, the failure or alleged failure of the COMPANY to perform any obligations owed to you shall not constitute a defense to the enforceability of such restrictive covenants.   Accordingly, you acknowledge that if you violate or are about to violate this Agreement, immediate irreparable injury to your EMPLOYER and the COMPANY will result, warranting (in addition to any other relief) the imposition of injunctive relief against you without the necessity of posting any bond.

13. If you breach any of the provisions of this Agreement, the duration of any applicable restrictive covenant shall commence from the date injunctive relief is granted or from the date that you cease such conduct that violates the restrictive covenant and shall be extended for an amount of time equivalent to any period of breach.

14. You agree to indemnify and pay your EMPLOYER and/or any COMPANY for the reasonable attorneys' fees and costs it incurs (including fees and costs incurred before the initiation of litigation, during litigation, and any trials, appeals and/or any petitions) to enforce the terms of the Agreement in the event you violate any of its terms or in the event you unsuccessfully challenge the validity or enforceability of any of the terms of this Agreement.

15. You agree that this Agreement applies to any position that you may hold as an employee of the COMPANY and shall continue in effect in the event of a promotion, demotion, retention by a different EMPLOYER or in a new position, or any other change in the

circumstances of your employment, including without limitation any change in the scope or nature of your responsibilities or assignment, your level or seniority, or your compensation or benefits.

16. You agree that your EMPLOYER may assign this Agreement and its rights and obligations, in whole or in part, to any affiliate or third party, including in connection with any merger, sale of assets, sale of stock or any other form of transaction that pertains to all or part of its business or the business of any other COMPANY. Each COMPANY is an express third-party beneficiary of this Agreement.

17. Nothing in this Agreement shall limit or affect any common law duties you have to any COMPANY, including, but not limited to, your duty of loyalty.

18. During your employment, while you may investigate other employment or business opportunities, you acknowledge and agree that you are subject to a duty of loyalty. Therefore, you agree that during your employment, you will not, directly or indirectly, among other things, compete against the COMPANY; do anything to impair your EMPLOYER's business or relationships with its CUSTOMERS; inform CUSTOMERS that you are terminating your employment and starting a competing business or going to work for a COMPETITOR; contact a CUSTOMER on behalf of a COMPETITOR; recommend a COMPETITOR or a COMPETITOR's products or services; engage in training on or assist in selling or promoting a COMPETITOR's products or services; engage in recruitment or solicitation of other employees of your EMPLOYER or any COMPANY to join a COMPETITOR.

19. This Agreement will be governed by and interpreted according to the laws of the State of New Jersey, without regard to its conflict of law rules. Any action that you initiate relating to or arising out of this Agreement must be brought in the courts of the State of New Jersey or, if subject matter jurisdiction exists, in the United States District Court for the District of New Jersey. You consent to personal jurisdiction and venue in both New Jersey State and Federal courts and to service of process by United States mail or express courier service in any such action. Any litigation initiated by you in any other forum or jurisdiction must be transferred to an appropriate court in New Jersey.

20. You irrevocably consent not to sue the COMPANY in any jurisdiction other than the state or federal courts of New Jersey for the purposes of any action arising out of or related to this Agreement. You further agree not to assist, aid, abet, encourage, be a party to, or participate in the commencement or prosecution of any lawsuit or action by any third party arising out of or related to this Agreement in any jurisdiction or venue other than a state or federal court in New Jersey.

21. In the event that any provision of this Agreement is invalidated or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions. To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited.

22. The following applies only to a Minnesota employee: Paragraph 1 does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of the COMPANY was used to conceive or reduce to practice such INVENTION and which was developed entirely by you on your own time, and (a) which does not relate at the time of conception or reduction to practice of the INVENTION (i) to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by you for your EMPLOYER.

23. The following applies only to a California, Delaware, Illinois, Kansas, or North Carolina employee: Paragraph 1 above does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of the COMPANY was used and that was developed entirely on your own time, unless (a) the INVENTION relates at the time of conception or reduction to practice of the INVENTION (i) to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, or (b) the INVENTION results from any work performed by you for your EMPLOYER. For California employees, the requirement to assign your rights in an invention to your EMPLOYER does not apply to an invention which qualifies fully under the provisions of California Labor Code Section 2870.

24. The following applies only to a State of Washington employee: Paragraph 1 above does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of any COMPANY was used and that was developed entirely on your own time, unless (a) the INVENTION relates at the time of conception or reduction to practice of the INVENTION (i) directly to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, and (b) the INVENTION results from any work performed by you for your EMPLOYER.

25. Nothing contained in this Agreement shall be deemed to confer on you any rights with respect to the duration of your employment. YOUR EMPLOYMENT IS TERMINABLE AT WILL BY EITHER YOUR EMPLOYER OR YOU, WITH OR WITHOUT CAUSE, EXCEPT THAT IF YOU INITIATE THE TERMINATION, THERE SHALL BE, AT YOUR EMPLOYER'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER YOU GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE. If your EMPLOYER elects to continue your employment during the notice period, it shall advise you of that fact and of the duration of the notice period. During any notice period, you will provide such transitional services as your EMPLOYER may request. Your EMPLOYER will be obligated to continue your pay during the notice period, and your duty of loyalty to your EMPLOYER will continue through such period.

26. This Agreement sets forth the entire agreement between the parties relating to its subject matter and supersedes all prior agreements, written or oral, between them relating to its subject matter. In the event that this Agreement be declared invalid, void, or unenforceable for any reason, then you understand, agree, and acknowledge any non-compete, confidentiality, non-solicitation, and/or non-disclosure agreement previously entered between you and any COMPANY, which was superseded by this Agreement, shall be reinstated and remain in full force and effect. No modification of or amendment to this Agreement will be effective unless it is in writing and signed by you and an authorized representative of your EMPLOYER. You represent that you have not relied on any representations by any representative of the COMPANY concerning the subject matter of this Agreement that are not expressly stated in this Agreement.

YOU ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS AGREEMENT, AND YOU AGREE TO THE TERMS ABOVE AND ACKNOWLEDGE THAT YOU INTEND TO BE LEGALLY BOUND BY THIS AGREEMENT.

DATE: _2/1/.5_

_____
EMPLOYEE SIGNATURE

_Joseph Hart_
Print Employee Name (Please Print)

_3,1 Laurel Rd_
Address

_Northport, NY 11768_
City/State

# EXHIBIT C



PART OF THE *Johnson-Johnson* FAMILY OF COMPANIES

May 19, 2016

<u>Via Email and US Mail</u>

Joseph Hart
1724 SW 3rd Pl
Cape Coral, FL 33991

Re: Biosense Webster ("BWI") Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation
Agreement (the "Non-Compete Agreement")

Dear Joe:

Thank you for informing us of your resignation and your intention to accept employment with St. Jude Medical
("SJM"). SJM is a BWI Competitor as that term is defined in the Non-Compete Agreement because SJM sells
competitive products and/or could benefit from BWI's Confidential Information or your use of BWI's customer
relationships. Therefore, I am writing to remind you of your continuing obligations to BWI under the Non-
Compete Agreement, a copy of which is attached.

First, BWI has invested time, energy and resources in developing and maintaining the secrecy of its Confidential
Information. BWI values its Confidential Information and has a legitimate business interest in protecting it. Thus,
we remind you of your obligation not to use or disclose, either directly or indirectly, to or for the benefit of SJM (or
any other third party) any of BWI's Confidential Information. Please note that Non-Compete Agreement defines
Confidential Information to include, among other things, BWI's customer lists, the names or significance of BWI's
customers, and BWI's customers' preferences, needs, requirements, purchasing histories, likes, dislikes, habits
and other customer-specific information.

As a further means of protecting BWI's Confidential Information, including its customer relationships, the Non-
Compete Agreement also provides that for 18 months following the end of your employment with BWI (e.g., until
November 20, 2017), "you shall not, directly or indirectly, contact, call upon, solicit business from, sell to, or
render services to" any of your BWI Customers (as that term is defined in the Non-Compete Agreement). This
restriction applies to the Customers with whom you worked or with whom you had any contact during the last 18
months of your employment with BWI (and since you worked for BWI for less than 18 months, the restriction
applies to all the BWI Customers with whom you worked). Those Customers include the hospitals at which you
provided services (including the employees of those hospitals) as well as the physicians with whom you worked
or on whom you called for BWI. For the sake of clarity, those Customers include, but may not be limited to, the
following:

| HOSPITALS | PHYSICIANS | |
|---|---|---|
| ALL CHILDRENS HOSP INC | Mathew | Vatthyam |
| BAYFRONT HLTH PRT, Port Charlotte | Gandhi | Gallastegui |
| BAYFRONT MEDCL CTR, St. Petersburg | Shah | Makati |
| FAWCETT MEML HOSP | Sheppard | Yin |
| HEALTHPARK MEDCL CTR | Sensequa | Lawrence |
| JAMES A HALEY VA HOSP | Eckart | Plunkitt |
| LARGO MEDCL CTR | Cuello | Hazlitt |
| MORTON PLANT HOSP | Norris | Cossu |
| NCH HLTHCARE SYS, Naples Community | Moondra | Agarwal |
| Hosp | | Decker |
| NORTHSIDE HOSPITAL, St. Petersburg | | |
| PHYSICIANS REGL MEDCL | | |

Biosense Webster, Inc.
3333 S. Diamond Canyon Road
Diamond Bar, CA 91765, USA
www.biosensewebster.com
TEL: 1-909-839-8500
TEL: 1-800-729-9010
FAX 1-909-468-2905



**PART OF THE Johnson-Johnson FAMILY OF COMPANIES**

SARASOTA MEML HOSP
ST JOSEPHS HOSP, Tampa
VA HOSP TAMPA SSF
VENICE REGL MEDCL CTR
MT. SINAI MEDCL CTR, Miami Beach
UNIV OF MIAMI HOSP

Cardona
Cutro
Burton
Wilson
Garner
Leonelli

McCormack

To ensure there is no misunderstanding regarding your obligations under the Non-Compete Agreement, with respect to the BWI Customers identified above, you may not, directly or indirectly: a) provide product support for SJM's CRM or EP/AF products; b) sell or solicit business with regard to SJM's CRM or EP/AF products; or c) be compensated for the sale of SJM's CRM or EP/AF products. These restrictions apply to the physicians identified above whether they are performing services at one of the hospitals identified above or at any other facility (even if you did not work at such facility during the last year of your employment with BWI).

Lastly, I would like to remind you of your obligations under the Employee Relocation Repayment Agreement, a copy of which is enclosed. As you recall, in connection with BWI's agreement to pay for your relocation from New York to Florida you agreed to repay the company if you resigned your employment before the end of the second anniversary of your employment. Given that you have decided to leave voluntarily before the end of the two year period, you are obligated to repay the company 50% of the costs BWI incurred in connection with your relocation. I understand that, by separate letter, the J&J Relocation Services department has advised you that the amount you owe under this agreement is $18,737. Your failure to repay the company voluntarily may result in you becoming obligated to pay, in addition to the sum identified above, an amount equal to the attorneys' fees and costs BWI incurs to enforce its rights and your obligations under the Employee Relocation Repayment Agreement.

Please contact me if you have any questions regarding your continuing obligations to BWI or if you disagree with the list of Customers we have currently identified.

We wish you the best of luck in your future endeavors.

Sincerely,

Genevieve King
HR Business Partner
Phone: 949-450-6714
Email: gking8@its.jnj.com

CC: Brandon Allen

**Biosense Webster, Inc.**
3333 S. Diamond Canyon Road
Diamond Bar, CA 91765, USA
www.biosensewebster.com
**TEL:** 1-909-839-8500
**TEL:** 1-800-729-9010
**FAX** 1-909-468-2905

# EXHIBIT D

Joseph Hart | LinkedIn



Search for people, jobs, companies, and more...    Advanced

**Joseph Hart**
Sr. Field Clinical Engineer / Sr. Technical Specialist St. Jude Medical

Fort Myers, Florida Area | Medical Devices

| | |
|---|---|
| Current | St. Jude Medical |
| Previous | Biosense Webster, St. Jude Medical |
| Education | St. John's University |

**118**
connections

Send Joseph InMail

https://www.linkedin.com/in/joseph-hart-8a4b97a9

**Background**

**Summary**

Hart_resume_cv

**Experience**

**Sr. Field Clinical Engineer / Sr. Technical Specialist**
St. Jude Medical
May 2016 – Present (1 month) | SW Florida

• Expert in cardiac anatomy & physiology.
• Expert on the biophysics of cardiac ablation.
• Certified in contact and non contact mapping techniques.
• Vast knowledge of unipolar & bipolar mapping techniques.
• Vast knowledge of cardiac echocardiography.
• Responsible for the training of new employees in the field of cardiac mapping.
• Vast knowledge of pacemaker & defibrillator implantation techniques.
• Certified in management of Bradycardia & Tachycardia arrhythmias.
• Programming of single chamber, dual chamber, CRT, & rate modulated pacing.
• Responsible for intra-operative measurements to ensure proper device function.
• Performed routine follow up checks for patients post implantation.

**Clinical Account Specialist**
Biosense Webster
March 2015 – May 2016 (1 year 3 months) | SW Florida

https://www.linkedin.com/in/joseph-hart-8a4b97a9

5/19/2016

Joseph Hart | LinkedIn



• Provide clinical support for cardiac Electrophysiology procedures utilizing the Carto 3 3D mapping system.
• Provide clinical support during cardiac Electrophysiology procedures utilizing the accunav and carto sound intracardiac echo catheters.
• Educate hospital lab staff on Electrophysiology base knowledge and the utilization of the Biosense Webster product line.
• Apply the vast knowledge obtained in previous positions to a new company and product line.

**Sr. Field Clinical Engineer**
St. Jude Medical
June 2007 – February 2015 (7 years 9 months) | New York, New York

• Expert in cardiac anatomy & physiology.
• Expert on the biophysics of cardiac ablation.
• Certified in contact and non contact mapping techniques.
• Vast knowledge of unipolar & bipolar mapping techniques.
• Vast knowledge of cardiac echocardiography.
• Responsible for the training of new employees in the field of cardiac mapping.

**Sales Associate / Sr. Technical Specialist**
St Jude Medical
2004 – June 2007 (3 years) | New York, New York

• Continued to perform all duties of Technical Service Specialist.
• Called on various electrophysiologists as well as the referring cardiology community.
• Trained new employees in the technical aspects of pacing & defibrillation.
• Became preferred industry representative for NY Medical Center of Queens.

**Technical Service Specialist**
St. Jude Medical
August 2003 – August 2004 (1 year 1 month) | New York, New York

• Vast knowledge of pacemaker & defibrillator implantation techniques.
• Certified in management of Bradycardia & Tachycardia arrhythmias.
• Programming of single chamber, dual chamber, CRT, & rate modulated pacing.
• Responsible for intra-operative measurements to ensure proper device function.
• Performed routine follow up checks for patients post implantation.

**Field Intern**
St. Jude Medical
March 2003 – July 2003 (5 months) | New York, New York

• Completed training in cardiac anatomy & physiology.
• Completed training in hemodynamics of cardiac pacing & defibrillation.
• Observed multiple electrophysiology operative procedures.
• Ultimately became certified in all Cardiac Rhythm Management fields.

Skills

Top Skills

Cardiac...
Cardiac Mapping
1   Cardiac Rhythm...
Medical Device Sales
4   Medical Devices
Echocardiography
Training
Healthcare
1   Hospitals

https://www.linkedin.com/in/joseph-hart-8a4b97a9

Joseph Hart | LinkedIn

3   Capital Equipment | Search for people, jobs, companies, and more... | Advanced

Joseph also knows about...

Clinical Trials | 1   Market Development | 1   Product Launch | 2   Pacemakers

3   Electrophysiology | 2   Cardiology | 3   Operating Room | Disposables

1   Clinical Research

## Education

**St. John's University**
Bachelor of Science (B.S.), Finance, General
2000 – 2002

Groups

**EP Lab Digest**
2,634 members
Join

**Jobs in Medical Sales**
13,072 members
Join

**Electrophysiology C...**
2,847 members
Join

**Cardiovascular Medi...**
35,811 members
Join

**Diagnostic & Interve...**
4,529 members
Join

Following

## News

**Pulse**
959,713 followers
Following

## Companies

**Heart Rhythm Society**
Hospital & Health Care
Follow

**Biosense Webster**
Medical Devices
Follow

**Abbott**
Hospital & Health Care
Follow

**BIOTRONIK**
Medical Devices
Follow

**CardioFocus**
Medical Devices
Follow

**Medtronic**
Medical Devices
Follow

**Topera**
Medical Devices
Follow

See 7 more

People also viewed
Louis Scala --



**Schools**

Search for people, jobs, companies, and more...    Advanced

St. John's University
Greater New York City
Area
Follow

Help Center | About | Careers | Advertising | Talent Solutions | Sales Solutions | Small Business | Mobile | Language | Upgrade Your Account

LinkedIn Corporation © 2016 | User Agreement | Privacy Policy | Ad Choices | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback

People also viewed
Louis Scala —                    ✕          ›

# EXHIBIT E

